UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SPARTECH CORPORATION | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ATLAS ALCHEM PLASTICS, INC., d/b/a | ) | |
| SPARTECH PLASTICS | ) | |
| | ) | |
| Plaintiffs, | ) | No. |
| | ) | |
| vs. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| ALBERT HODGIN | ) | |
| | ) | |
| Serve at:   11 Phillip Avenue | ) | |
| Burlington, MA 01803 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COME NOW Plaintiffs Spartech Corporation ("Spartech Corporation") and Atlas Alchem Plastics, Inc., d/b/a Spartech Plastics, Inc. ("Spartech Plastics") and for their cause of action for injunctive and other relief against Defendant Albert Hodgin ("Hodgin") states as follows:

## PARTIES, JURISDICTION AND VENUE

1.     Spartech Corporation is organized under the laws of the State of Delaware and maintains its principal place of business in Clayton, Missouri. Spartech Plastics is organized under the laws of the State of Delaware and maintains offices in Paulding, Ohio, McMinnville, Oregon, Arlington, Texas, Cape Girardeau, Missouri and Wichita, Kansas. Spartech Plastics is a wholly-owned subsidiary of Spartech Corporation. Hereinafter, Spartech Corporation and Spartech Plastics are collectively referred to as "Spartech".

2.     Defendant Hodgin is a Massachusetts citizen.

3.      Defendant Albert Hodgin is subject to personal jurisdiction in this Court in that this lawsuit is directly associated with Hodgin's employment with Spartech and on numerous occasions Hodgin traveled to St. Louis in connection with his employment, Hodgin intentionally directed his tortious conduct at Spartech in Missouri, and this cause of action arises from Hodgin's conduct in Missouri and Hodgin's conduct directed at Spartech in Missouri. Moreover, this lawsuit arises out of Hodgin's breach of a Confidentiality Agreement, which Hodgin signed, in part, as a pre-requisite to attending a strategic sales meeting Spartech held in St. Louis, and the Confidentiality Agreement provides that it will be governed by Missouri law.

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332 in that this case involves a federal question, and there is complete diversity of citizenship among the parties, and the amount in controversy in this action exceeds $75,000.00.

5.      Venue is proper under 28 U.S.C. § 1391(b)(2) because this action is not founded solely on diversity of citizenship and a substantial part of the events giving rise to the claim occurred in the Eastern District of Missouri.

## BACKGROUND

6.      Spartech is a leading producer of engineered plastic sheet, polymeric compounds, and engineered products, based in Missouri, with its headquarters in Clayton, Missouri. (Declaration of Thomas Gavinski at ¶ 3.)

7.      The market for selling products Spartech manufacturers is highly-competitive. The prices, volume discounts and other credits a manufacturer provides to its individual customers are highly confidential, and often dictate whether a customer will purchase from Spartech or one of its competitors.  (*Id.* at ¶ 4.)

8.      Two kinds of pricing "credits" Spartech sometimes provides to its customers are "scrap" and "regrind" credits.  Spartech generally sells its plastic in large, thin sheets, which its

customers then "form" into a product shape. "Scrap" is the edge of product that is left over as the plastic is run down a production line. In other words, "scrap" represents the edges that are trimmed off to make the sheet the appropriate size. "Regrind" is scrap that has been ground up. Much of the plastic sold by Spartech is not 100% pure product; rather, Spartech purchases regrind and/or scrap back from its customers to recycle/incorporate into future orders. Spartech offers customer-specific pricing credits for the "regrind" and/or "scrap" it purchases back from its customers. (*Id.* at ¶ 5.)

9.    Winning orders from customers is highly dependant upon the overall price Spartech is able to offer its customers. The initial product pricing, volume discounts and regrind/scrap credits are all customer-specific variables that impact the overall pricing model Spartech offers to its customers. (*Id.* at ¶ 6.)

10.    Spartech has developed and maintains trade secrets, including but not limited to the following: (1) customer-specific information for the plastics products it sells, including, but not limited to, pricing, volume discounts, "regrind" credits and "scrap" credits; (2) customer lists; (3) prospective customers; and (4) Spartech's financial information. This information is hereinafter collectively referred to as Spartech's "Trade Secrets." (*Id.* at ¶ 7.)

11.    It would be extremely difficult for someone outside of Spartech who is not obligated to maintain the confidentiality of such information to recreate the information that constitutes Spartech's Trade Secrets and that enables Spartech to run a profitable business while providing efficient, competitive, and quality maintenance services to its customers at competitive prices. (*Id.* at ¶ 8.)

12.    The information constituting Spartech's Trade Secrets is of tremendous value to Spartech. By maintaining the secrecy of its Trade Secrets, Spartech is able to compete more effectively with other plastics manufacturers. (*Id.* at ¶ 9.)

13.     Because of the importance of Spartech's Trade Secrets to Spartech, Spartech has implemented a policy requiring that sales personnel that may be permitted access to Spartech's Trade Secrets sign a "CONFIDENTIALITY AGREEMENT", which requires, among other things, that Spartech's employees keep confidential information strictly confidential and not release any information outside of Spartech.  Spartech's Trade Secrets generally are not available to third parties outside of Spartech, nor can they be accessed without direct access to Spartech's computer system or on-site files.  In addition, Spartech maintains other reasonable safeguards to guard its Trade Secrets.  These safeguards include, but are not limited to: requiring Spartech employees to enter a unique password to access Spartech's network; and limiting access to Spartech's Trade Secrets to employees with a legitimate business reason for knowing such information.  Moreover, Spartech typically requires its customers and/or vendors to sign a confidentiality agreement covering the confidential or proprietary data shared between the parties (or conversely, Spartech typically signs the customer or vendor's form).  (*Id.* at ¶ 10.)

### HODGIN'S EMPLOYMENT WITH SPARTECH

14.     Hodgin was a salesman with Spartech Plastics for nearly twenty (20) years. Hodgin worked out of his home in Massachusetts and was responsible for customers in the northeastern United States.  During his time at Spartech, Hodgin was a very successful salesperson.  (*Id.* at ¶ 11.)

15.     Hodgin was responsible for overseeing millions of dollars of Spartech's sales, and was given access to and detailed knowledge of all aspects of Spartech's business, including Spartech's Trade Secrets and its other confidential information.  He had direct contact with Spartech's customers and potential customers.  (*Id.* at ¶ 12.)

16.     In particular, Hodgin was the salesperson on the customer accounts of three of Spartech Plastics' largest and most important customers.  These customers are strategic accounts

4

in that they primarily purchase products with a higher "value added" component, as opposed to primarily commodity plastic. Therefore, the products sold to these customers are amongst the most profitable lines within Spartech Plastics. (*Id.* at ¶ 13.)

  17. As a result of his responsibilities at Spartech, Hodgin was highly compensated by Spartech. (*Id.* at ¶ 14.)

## CONFIDENTIALITY AGREEMENT

  18. On February 11, 2008, Hodgin signed a Confidentiality Agreement (the "Confidentiality Agreement") regarding his employment with Spartech. (A true and accurate copy of the Confidentiality Agreement is attached hereto as Exhibit A, and incorporated herein by reference); (*See also* T. Gavinski Decl., at ¶ 15.)

  19. In the Confidentiality Agreement, Hodgin acknowledged that he was privy to confidential information of Spartech that was highly important to Spartech's success, including:

> trade secrets and know-how which is not generally known to the public and which relates to Spartech, its customers, its suppliers, or other persons having business with it, including but not limited to product and raw material specifications and formulas, price lists and pricing methods, customer and supplier lists, marketing plans, purchasing and sales histories, terms and conditions of customer contracts and customer service requirements, business procedures and processes, and operating costs (collectively, "*Confidential Information*").

(Exh. A).

  20. In the Confidentiality Agreement Hodgin further agreed that:

> I agree to share Confidential Information only with employees or representatives of Spartech who have a need to know it, and not to disclose Confidential Information to any other person, inside or outside the workplace, without the express prior written consent or direction of a representative of Spartech's Management. ***Upon termination of my employment I will deliver to Spartech, without keeping any copies, all documents, notes or files (including electronic files) containing any Confidential Information***.

(*Id.*) (emphasis added).

## HODGIN ACCEPTS EMPLOYMENT FROM PRIMEX

21.     Primex Plastics Corporation ("Primex"), based in Richmond, Indiana, is a plastics extruding company and is Spartech's largest direct competitor. (T. Gavinski Decl., at ¶ 16.)

22.     Hodgin submitted his voluntary resignation to Spartech on or about August 22, 2008. (T. Gavinski Decl., at ¶ 17.)

23.     Upon information and belief, Hodgin was hired by Primex to perform the same role he had performed for Spartech. Specifically, Hodgin has informed Spartech's Steve Ploeger that he will serve as an independent sales representative for Primex, selling Primex's products in the Northeastern Region, meaning he will call on a number of the same customers on which he called for Spartech. Hodgin's employment and position with Primex was confirmed by Primex's Vice-President of Sales & Marketing, Tim Schultz, in a discussion with Steve Ploeger. Mr. Schultz also informed Ploeger that Hodgin approached Primex about employment, doing so by making a "proposal" to Primex, although Mr. Schultz did not elaborate on the "proposal" Hodgin made. (Declaration of Steve Ploeger, at ¶ 5.)

## HODGIN MISAPPROPRIATES SPARTECH'S CONFIDENTIAL INFORMATION AND TRADE SECRETS

24.     Unbeknownst to Spartech, before his last day of employment with Spartech (August 22, 2008), Hodgin emailed numerous Spartech Trade Secrets and confidential information to his personal America On-Line ("AOL") email account. (T. Gavinski Decl. at ¶ 18.)

25.     Included in these documents were correspondence to the strategic customers discussed above, as well as other customers, wherein Spartech informed those customers of current pricing, volume discounts, and regrind/scrap credits available for those respective customers. (A true and accurate copy of the emails and attachments sent by Hodgin to his AOL

account are being filed under seal as group Exhibit B hereto, and are incorporated herein by reference) (*see also* T. Gavinski Decl., at ¶ 19.)

26.     Further, Hodgin emailed to his AOL account a copy of Spartech's "Aging" Accounts Receivable report for *all* Spartech customers. This report lists the payment terms for all of Spartech's customers and the amounts each customer currently owes Spartech for ordered product. (A true and accurate copy of the email and Aging Accounts Receivable report sent by Hodgin to his AOL account are being filed under seal as Exhibit C hereto, and are incorporated herein by reference); (*see also* Decl. of T. Gavinski at ¶ 20.)

27.     By misappropriating the foregoing documents (Trade Secrets), Hodgin and Primex are able to unfairly compete against Spartech and divert Spartech's customers and potential customers to Primex because Hodgin would have Spartech's pricing models and customer information, including the important pricing models for Spartech's strategic customers. (T. Gavinski Decl., at ¶ 21.)

28.     By virtue of his position with Spartech, Hodgin developed relationships with many of Spartech's customers, and through these relationships, together with the Trade Secrets that Hodgin misappropriated from Spartech, Hodgin is able to solicit and divert these customers, directly or indirectly, and consistently underbid Spartech for their business. Due to the highly-competitive nature of the plastics business, pricing models, volume discounts and other credits are critical to making sales. By misappropriating this information that Spartech has provided to its customers and potential customers for offering plastics for sale, and because of Hodgin's relationships with Spartech's customers and his knowledge of Spartech's Trade Secrets, Hodgin can unfairly compete with Spartech and divert significant business from Spartech by offering lower pricing or more favorable credits to induce Spartech's customers to give their business to Primex. (*Id.* at ¶ 22.)

## COUNT I

## VIOLATION OF THE MISSOURI UNIFORM TRADE SECRETS ACT

29.     The allegations stated in Paragraphs 1 through 28 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

30.     Spartech derives independent economic value from Spartech's Trade Secrets. Spartech's Trade secrets are not generally known to, and not readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

31.     Furthermore, Spartech's Trade Secrets are the subject of reasonable efforts to maintain secrecy, including but not limited to requiring Spartech's employees (including Hodgin) to execute Spartech's Confidentiality Agreement, adhere to Spartech's confidentiality policies, limiting access to employees with a legitimate business reason for knowing such information, and maintaining physical, electronic, and procedural safeguards.

32.     Through his position of employment with Spartech, Hodgin had access to Spartech's confidential and proprietary information, including Spartech's Trade Secrets.

33.     By virtue of the Confidentiality Agreement and/or the duty of loyalty Hodgin owed to Spartech, Hodgin knew or had reason to know that he acquired Spartech's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.

34.     Hodgin misappropriated Spartech's Trade Secrets by, *inter alia*:

      a.    acquiring Spartech's Trade Secrets and/or acquiring other of Spartech's Trade Secrets with reason to know that said Trade Secrets were acquired by improper means;

      b.    accessing, using, and/or disclosing Spartech's Trade Secrets for his and/or Primex's benefit without Spartech's knowledge or consent.

35.     Hodgin has acted with evil motive or with reckless indifference to the rights of Spartech.

36.    Hodgin's misappropriation of Trade Secrets has caused substantial and irreparable damage to Spartech by giving him and/or Primex an unfair competitive advantage over Spartech and placing them in a position to divert substantial business from Spartech.

37.    Unless Hodgin is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten Spartech's business, and Spartech will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

38.    Through the factual allegations contained herein, Spartech has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Spartech.

## COUNT II

## BREACH OF DUTY OF LOYALTY

39.    The allegations stated in Paragraphs 1 through 38 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

40.    As an employee of Spartech, Hodgin owed Spartech a duty of loyalty and was obligated not to compete with or act contrary to the interests of Spartech.

41.    Hodgin breached his duty of loyalty to Spartech by acting contrary to the interests of Spartech while still employed by Spartech by, *inter alia*, misappropriating Spartech's information, documents, and forms for himself and/or Primex.

42.    Hodgin's actions were performed with an evil motive or with reckless indifference to the rights of Spartech.

43.    As a direct result of the foregoing events and actions undertaken by Hodgin, Spartech has suffered substantial and irreparable damage because Hodgin has taken Trade Secrets and other confidential information from Spartech and Hodgin and/or Primex have

received an unfair competitive advantage over Spartech and are in a position to divert substantial business from Spartech.

44.    Unless Hodgin is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten Spartech's business, and Spartech will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

45.    Through the factual allegations contained herein, Spartech has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Hodgin.

## COUNT III

## BREACH OF CONTRACT

46.    The allegations stated in Paragraphs 1 through 45 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

47.    The Confidentiality Agreement is a valid and enforceable contract between Spartech and Hodgin.

48.    Hodgin has breached the Confidentiality Agreement by, *inter alia*, removing Spartech's business records and confidential information from Spartech's premises.

49.    Hodgin has breached and threatens to continue to breach the Confidentiality Agreement by, upon information and belief, disclosing, divulging, and sharing Spartech's Trade Secrets with Primex.

50.    Through the actions set forth herein, Hodgin has given Spartech reasonable cause to believe that additional breaches of the Confidentiality Agreement are imminent.

51.    By virtue of the foregoing events and actions undertaken by Hodgin detailed herein, Hodgin and/or Primex are able to unfairly compete with Spartech and are in a position to

divert substantial business from Spartech.  Accordingly, Hodgin has caused, and will cause in the future, substantial and irreparable harm to Spartech, its business and operations, through the violation and continued breach of the Confidentiality Agreement.

52.    Unless Hodgin is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten Spartech's business, and Spartech will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

53.    Through the factual allegations contained herein, Spartech has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Hodgin.

## COUNT IV

## VIOLATION OF THE MISSOURI COMPUTER TAMPERING ACT § 537.525, RSMo.

54.    The allegations stated in Paragraphs 1 through 53 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

55.    Hodgin tampered with Spartech's computer data by taking and/or disclosing Spartech's Trade Secrets and other electronically stored information from Spartech's computers, computer network, and/or computer system without authorization or reasonable grounds to believe that he had such authorization.

56.    Spartech has been damaged by Hodgin's unauthorized disclosure, taking, receipt, retaining, and/or use of data from Spartech's computers because it has incurred fees for the examination of certain computers and because Hodgin and/or Primex have received an unfair competitive advantage over Spartech and have been placed in a position to divert substantial business from Spartech.  Spartech has further been damaged in that it has expended attorneys' fees in connection with this matter.

57.     In taking, receiving, retaining, using, or disclosing data from Spartech's computer network, and/or computer system, Hodgin's actions were performed with an evil motive or with reckless indifference to the rights of Spartech.

58.     Unless Hodgin is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten Spartech's business, and Spartech will suffer, immediate, substantial, and irreparable harm from the aforesaid actions.

59.     Through the factual allegations contained herein, Spartech has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Hodgin.

## COUNT V

## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030

60.     The allegations stated in Paragraphs 1 through 59 of this Complaint are incorporated by reference herein with the same force and effect as if set forth fully below.

61.     Spartech's computers are protected computers used in interstate commerce.

62.     Hodgin knowingly, intentionally, and with intent to defraud accessed Spartech's computers without authorization, or exceeded his authorized access by virtue of breaches of his duty of loyalty to Spartech and Spartech's confidentiality policy and Hodgin's Confidentiality Agreement with Spartech.

63.     Hodgin obtained information from Spartech's computers without Spartech's permission.  Such conduct furthered Hodgin's intended fraud.

64.     By virtue of Hodgin's intentional act of accessing Spartech's computers without authorization, Hodgin has recklessly caused loss to Spartech.  Spartech has suffered damages and a loss of no less than $5,000, including but not limited to its costs to respond to the offense.

65.    Hodgin has acted with evil motive or with reckless indifference to the rights of Spartech.

66.    By virtue of the foregoing events and actions undertaken by Hodgin detailed herein, Hodgin and/or Primex are able to unfairly compete with Spartech and are in a position to divert substantial business from Spartech. Accordingly, Hodgin has caused, and will cause in the future, substantial and irreparable harm to Spartech, its business and operations.

67.    Unless Hodgin is temporarily, preliminarily, and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten Spartech's business, and Spartech will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

68.    Through the factual allegations contained herein, Spartech has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Hodgin.

## PRAYER FOR RELIEF FOR ALL COUNTS

WHEREFORE, Plaintiffs Spartech Corporation and Atlas Alchem Plastics, Inc., d/b/a Spartech Plastics, respectfully pray for the following relief:

    a.    For a Temporary Restraining Order, and thereafter Preliminary and Permanent Injunctions:

        i.    directing Hodgin and anyone acting in concert or participation with Hodgin to immediately return to Spartech any and all electronic and hard copies of Spartech's Trade Secrets and all other of Spartech's confidential and proprietary information; and further directing that after the return to Spartech of any and all Spartech's Trade Secrets and all other of Spartech's confidential and proprietary information, that Hodgin and anyone acting in concert or participation with Hodgin destroy any and all remaining copies of Spartech's Trade Secrets and any and all remaining copies of Spartech's other confidential and proprietary information;

        ii.    directing that Hodgin and anyone acting in concert or participation with Hodgin not turn-on, power-up, or activate any personal

computers (including but not limited to any home and work computers) used by Hodgin, and enjoining Hodgin and anyone acting in concert or participation with Hodgin from deleting any data from, reformatting, or taking any other action to alter data contained on any computers (home or work computers), data processing machines, e-mail accounts, wireless e-mail machines, cellular phones or other equipment used by Hodgin, and further directing that Hodgin make available for forensic examination and forensically-sound mirror-imaging at Hodgin's cost by a computer forensics expert selected by Spartech within forty-eight (48) hours any such home and work computers data processing machines, e-mail accounts, wireless e-mail machines, cellular phones or other equipment used by Hodgin and anyone acting in concert or participation with Hodgin.

iii.   directing that within forty-eight (48) hours following inspection and copying by Spartech's computer forensics expert, Hodgin and anyone acting in concert or participation with Hodgin must remove and delete any and all Spartech's Trade Secrets and all other of Spartech's confidential and proprietary information from any computers, data processing machines, e-mail accounts, wireless e-mail machines, cellular phones or other equipment in his possession or control;

iv.   directing that following the removal and deletion of any and all of Spartech's Trade Secrets, and all other of Spartech's confidential and proprietary information from any computers, data processing machines, e-mail accounts, wireless e-mail machines, cellular phones or other equipment in his possession or control, Hodgin allow a computer forensics expert selected by Spartech to verify at Hodgin's cost that any and all of Spartech's Trade Secrets or any other of Spartech's confidential and proprietary information has been deleted from any computers, data processing machines, e-mail accounts, wireless e-mail machines, cellular phones or other equipment used by Hodgin and anyone acting in concert or participation with Hodgin;

v.   directing Hodgin and anyone acting in concert or participation with Hodgin to provide Spartech with access to inspect all e-mail accounts (including but not limited to any gmail, hotmail, or yahoo accounts) used for conducting any business of Spartech and/or Primex by Hodgin and/or anyone acting in concert or participation with Hodgin while he was employed by Spartech, as well as all other information necessary to access and inspect such email accounts;

vi.   enjoining Hodgin and anyone acting in concert or participation with Hodgin from soliciting, directly or indirectly, for Primex or any of its affiliate companies and any other competitor of Spartech,

any customers of Spartech identified in Exhibit B filed under seal and attached hereto in competition with Spartech for a period of twenty-four (24) months; and

vii.    enjoining Hodgin and anyone acting in concert or participation with Hodgin from using, disclosing, copying, revealing or discussing any of Spartech's Trade Secrets and all other of Spartech's confidential or proprietary information for a period of sixty (60) months;

b.    For damages in excess of $75,000.00 in an amount that is fair and reasonable;

c.    For Spartech's attorneys' fees and costs incurred herein; and

d.    For all other such relief that this Court deems to be just and proper.

ARMSTRONG TEASDALE LLP

BY: _____
       William M. Corrigan, Jr.              #2879
       Brent M. Covington              #517863
       One Metropolitan Square, Suite 2600
       St. Louis, Missouri 63102-2740
       (314) 621-5070
       (314) 621-5065 (facsimile)
       wcorrigan@armstrongteasdale.com
       bcovington@armstrongteasdale.com

ATTORNEYS FOR PLAINTIFFS